# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BARBATINE NORCEIDE, NARCES ) <br> NORCEIDE, and JACK WALSH on behalf ) <br> of themselves and all others similarly situated, ) <br>     Plaintiffs, ) <br> ) <br> v.                                               ) <br> ) <br> CAMBRIDGE HEALTH ALLIANCE, d/b/a ) <br> Cambridge Hospital, Somerville Hospital, and ) <br> Whidden Hospital, ) <br>     Defendant. ) | Civil Action No. 10cv11729-NG |

GERTNER, D.J.:

**MEMORANDUM AND ORDER RE: MOTION TO DISMISS, MOTION TO AMEND, MOTION FOR CONDITIONAL CERTIFICATION**
August 28, 2011

This is a wage-and-hour class action in which current and former employees of Defendant Cambridge Health Alliance ("CHA") allege that CHA deprived them of compensation for time worked during their 30-minute meal breaks and before and after their shifts. They claim these practices were in violation of the Fair Labor Standards Act ("FLSA"), the Massachusetts Wage Act, and their employment contracts with CHA. The violations allegedly resulted from CHA's practice of pressuring its employees not to record time worked outside of their shifts, thereby routinely stripping its employees of wages to which they were entitled.

CHA has moved to dismiss most of Plaintiffs' state and federal law claims (document #16). Plaintiffs have moved to amend their complaint (document #29) and for conditional certification of their FLSA claims (document #15). For the foregoing reasons, CHA's motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**, Plaintiffs' motion to amend is **GRANTED**, and Plaintiffs' motion for conditional certification is **GRANTED**.

I.  **BACKGROUND**

Taking all well-pled allegations as true and making all reasonable inferences in Plaintiffs' favor, Gargano v. Liberty Int'l Underwriters, Inc., 572 F.3d 45, 48-49 (1st Cir. 2009), the facts are as follows:

Formed in 1996 and comprised of Cambridge Hospital, Somerville Hospital, and Whidden Hospital, along with more than 30 clinics, primary care centers, and community health centers, CHA is a healthcare system that serves the residents of Cambridge, Somerville and Boston's Metro-North region.  Compl. ¶¶ 16, 17 (document #8); Bennett Aff. ¶ 3 (document #21-1).  CHA employs approximately 4,200 people, including nurses, certified nursing assistants, secretaries, pharmacy technicians, dietary food workers, and housekeeping staff.  Id.; Gilyan Aff. ¶ 7 (document #21-15).  The three named Plaintiffs – Barbatine Norceide ("Barbatine"), Narces Norceide ("Narces"), and Jack Walsh ("Walsh") – are current and former, non-exempt, hourly employees of these hospitals.  Compl. ¶ 19.  Barbatine is a former unit secretary for Cambridge Hospital; Narces, a member of the Massachusetts Nurses Association ("MNA"), is a currently-employed registered nurse who practices at both Cambridge Hospital and Whidden Hospital; and Walsh is a former employee who worked both in the pharmacy department and as a Counselor and Patient Access Representative at Cambridge Hospital.  Id.

From October 12, 2007, through October 12, 2010 (the "class period"), Barbatine, Narces, Walsh, and the similarly-situated CHA workers they represent (collectively "Plaintiffs") routinely worked before and after their shifts and during their 30-minute meal breaks, often at the request of their supervisors.  Id. ¶¶ 20-22.  They were required to carry cell phones and pagers on them during their meals breaks and instructed to respond immediately to all calls.  Id.

¶ 20. As a result, employees often took "meals at their desks or in locations convenient so that they [could] be contacted by their supervisors and co-workers for work-related matters during their meal breaks." Id. "[N]early all of [Barbatine's] lunches were interrupted with work-related matters; a colleague, a doctor or a nurse or a patient always needed something," and she was regularly asked to stay an extra 30 to 60 minutes after her shifts ended. Barbatine Decl. ¶¶ 3, 6 (document #8-1). Narces' meal breaks "were interrupted more than half of the time," and he often completed preparatory tasks for about 10 minutes before his shifts began and was "expected" to stay late in order to "transition to the next shift." Narces Decl. ¶ 4 (document #8-2). Walsh "seldom" got a meal break and was often "directed" by his managers to work an additional 1-3 hours each week, either before or after his shifts. Walsh Decl. ¶ 4 (document #8-3).

CHA employed three different time-keeping systems during the class period. Up until late 2007, all non-exempt CHA employees were individually responsible for entering their time into an electronically maintained timesheet located on CHA's intranet, known as "Staffnet." Gilyan Aff. ¶ 4. After employees input their time, their managers reviewed the Staffnet entries and approved the timesheets. Id. ¶ 6. Beginning in late November 2007, CHA transitioned to a new software product called "ANSOS," which scheduled staff working in CHA's "costs centers" at the three hospital campuses. Id. ¶¶ 7, 11. The ANSOS system allowed managers to schedule the employees necessary to fill each shift and then print a paper schedule, which was posted in each clinical unit of the three hospitals. Id. ¶ 8. According to CHA, employees could make notations on this sheet when their time exceeded their scheduled hours. Id. ¶ 10. All employees

who did not work in "costs centers" – i.e., pharmacy technicians, housekeepers, laboratory technicians – continued to use Staffnet. Id. ¶ 7.

Then, in April 2008, CHA implemented a project to add an electronic timekeeping component, known as the McKesson Time and Attendance System, to the ANSOS system. Id. ¶ 12. This system allowed employees to record the time they began and ended their shifts by either swiping a card or entering the time into a webclock. Id. ¶ 15. The McKesson Time and Attendance system would then automatically deduct 30 minutes from the compensable working time, unless a manager informed payroll otherwise. Id. ¶¶ 15-16. The McKesson system was first rolled out in August 2009 for employees working in the laboratory at Cambridge Hospital and, then in October 2009, for employees covered by the collective bargaining agreement between CHA and the Massachusetts Nurses Association ("MNA"). According to CHA, Barbatine used McKesson Time and Attendance for a few weeks, Narces used ANSOS prior to the implementation of McKesson Time and Attendance, and Walsh only used Staffnet. Id. ¶¶ 17-18.

Regardless of what timekeeping system was used, CHA employees were routinely paid only for the time worked during their pre-scheduled shifts – which allotted 30-minutes for an unpaid meal break – rather the actual time during which they performed compensable labor. Compl. ¶¶ 9, 22–24. As a result, Walsh, Narces, and Barbatine claimed that they did not receive wages for about two to four hours of work each week. See Walsh Decl. ¶ 4; Narces Decl. ¶¶ 1, 4; Barbatine Decl. ¶¶ 2, 3, 6. While all three time-keeping systems theoretically enabled its employees to report time worked during a meal break or before/after a shift, CHA "fail[ed] and refused/discouraged payment of time outside of schedule shifts, creating an atmosphere w[h]ere

-4-

time worked outside of the schedule shift was 'swept under the rug' and not paid." Compl. ¶ 23. Accordingly to Narces, even when he complained that he worked through his break, "[t]here was no override of the payroll system's automatic deduction." Narces Decl. ¶ 3. Barbaine alleges that "[t]here was no avenue for [her] to complain that [she] did not get a meal break," and she could not "override . . . the payroll system's automatic deduction." Barbatine Decl. ¶ 5. According to Walsh, "[t]here was . . . an atmosphere whereby if you complained about not getting a meal break or not being paid for time worked outside of your scheduled shift, management would ask you: 'Do you still want your job?'" Walsh Decl. ¶ 5.

## II. DISCUSSION

There are three pending motions in this case: Defendant's motion to dismiss, Plaintiffs' motion to amend, and Plaintiffs' motion for conditional class certification. I will address each in turn.

### A. Defendant's Motion to Dismiss

CHA moves to dismiss on the following grounds: (1) Barbatine and Narces' federal and state overtime claims fail because they do not allege working more than 40 hours in a week; (2) Plaintiffs have failed to state a claim for a violation of the FLSA's minimum wage provision; (3) Plaintiffs are precluded from recouping unpaid wages pursuant to Mass. Gen. Laws ch. 148, § 149 because they have failed to exhaust their administrative remedies; and (4) as hospital employees, Plaintiffs are exempt from recouping unpaid overtime under state law. Addressing each, I must accept all well-pleaded facts as true and make all reasonable inferences in the Plaintiffs' favor. Gargano, 572 F.3d at 48. I may take into account documents "central to plaintiffs' claim" or "sufficiently referred to in the complaint" without converting a motion to

dismiss into one for summary judgment.  Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993).  To survive CHA's motion to dismiss, Plaintiffs' complaint must allege "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).

### 1. FLSA (Count I)

Enacted in 1938, the FLSA ensures basic worker rights for non-exempt employees.  It guarantees that every non-exempt employee be paid at least the minimum wage for each hour worked and receive overtime for time worked in excess of 40 hours in a workweek at a rate of not less than time and one-half their regular rates of pay.  29 U.S.C. §§ 206, 207.  As explained by the FLSA's governing regulations, "[w]ork not requested but suffered or permitted is work time."  29 C.F.R. § 785.11 ("For example, an employee may voluntarily continue to work at the end of the shift.").  Plaintiffs allege that, by failing to compensate them for time worked during meal breaks and outside of their scheduled shifts, CHA violated these two fundamental worker protections.[1]

#### a. Unpaid Minimum Wage

According to CHA, Plaintiffs' minimum wage claims should be dismissed because they do not allege that CHA ever paid them less than the operative minimum wage.  Specifically, CHA argues that, if the total wages paid to any given plaintiff in a week were divided by the total hours worked in the week, then the average hourly wage would be greater than the minimum wage.  For instance, suppose that one week Barbatine was scheduled to work 26 hours at a rate of $10.00 an hour and was paid accordingly, meaning she earned $260.  However, in

---

[1] Section 216 of the FLSA holds an employer who violates the provisions of § 206 or § 207 liable to the employee or employees affected in the amount of their unpaid minimum wages or their unpaid overtime compensation and an additional equal amount as liquidated damages.  29 U.S.C. § 216(b).

fact, she worked an additional 4 hours during her breaks and before/after her shifts and was not paid for this time. According to CHA, Barbatine has no claim for a minimum wage violation, since $260 divided by 30 hours is an average hourly wage of $8.67, which still exceeds the minimum wage.[2]

In reality, Plaintiffs counter, Barbatine was being paid at a rate of $0 per hour for her additional 4 hours. CHA intended for its payment of $260 to cover her scheduled shifts and nothing more. Barbatine's payment statement for the week in question on its face would indicate that she was getting paid for 26 hours of work, not 30. I agree with Plaintiffs.

The weekly average wage measuring rod that CHA argues should be utilized when assessing minimum wage violations stems from the Second Circuit's decision in United States v. Klinghoffer Bros. Realty Corp., 285 F.2d 487 (2d Cir. 1960). In that case, due to some financial difficulties their employer faced, security guard employees agreed to work an additional six hours per week but not be paid for this time until some later date. Id. at 489-90. The employer, however, never provided compensation for this extra work. The federal government charged the company with violating the FLSA. The Second Circuit dismissed the government's minimum wage claim on the basis of the weekly average wage theory. Id. at 490. Articulating the purpose of the FLSA only as "guarantee[ing] a minimum livelihood to the employees," the court found that "the Congressional purpose is accomplished so long as the total weekly wage paid by an employer meets the minimum weekly requirements of the statute, such minimum weekly requirement being equal to the number of hours actually worked that week multiplied by the

---

[2] For work performed from July 24, 2007 to July 23, 2008, the federal minimum wage was $5.85 per hour. For work performed from July 24, 2008 to July 23, 2009, the federal minimum wage was $6.55 per hour. Since July 24, 2009, the minimum wage has been $7.25 per hour.

minimum hourly statutory requirement." Id. at 490 (citing H.R. Rep. No. 75-2738, at 28 (1938); Sen. Rep. No. 75-884, at 1-3 (1937); H.R. Rep. No. 75-1452, at 8-9 (1937)).

Since the court's decision in 1960, several other circuits have adopted the Second Circuit's approach – what has come to be known as the Klinghoffer rule. However, they have mostly done so by citing to Klinghoffer without any further analysis of whether, in fact, the weekly average rule effectuates the legislative intent of the FLSA's minimum wage law. See, e.g., U.S. Dep't of Labor v. Cole Enter., Inc., 62 F.3d 775, 780 (6th Cir. 1995) (simply noting what "several courts have held"); Hensley v. MacMillan Bloedel Containers, Inc., 786 F.2d 353, 357 (8th Cir. 1986) (citing to Klinghoffer without analysis); Blankenship v. Thurston Motor Lines, 415 F.2d 1193, 1198 (4th Cir. 1969) (stating without explanation that Klinghoffer "contains a correct statement of the law"). The D.C. Circuit is a notable exception, accepting the weekly average wage rule in Dove v. Coupe only after its own analysis. 759 F.2d 167, 171-72 (D.C. Cir. 1985).[3] The First Circuit, however, has yet to address whether to use the hour-by-hour or the Klinghoffer weekly average measure for evaluating minimum wage law compliance. In my view, as explained below, the Klinghoffer weekly average method ignores the plain

---

[3] Claiming that the purpose of the FLSA's minimum wage law is to "'protect certain groups of the population from sub-standard wages . . . due to . . . unequal bargaining power,'" Dove, 759 F.2d at 171 (quoting Brooklyn Sav. Bank v. O'Neil, 324 U.S. 697, 706 (1945)), the D.C. Circuit first recognized Klinghoffer's finding that this purpose "is accomplished so long as the total weekly wage paid by an employer meets the minimum weekly requirements." Dove at 171. The court continued its analysis by noting that while the "minimum wage laws logically could be construed as requiring hour-by-hour compliance," it followed that "both administrative and judicial decisions established the workweek as the measuring rod for compliance at a very early date." Id. (citing Travis v. Ray, 41 F. Supp. 6, 9 (D.C. Ky. 1941). In support, the court cited to a 1942 manual published by the Department of Labor's Wage and Hour Division, Wage & Hour Release No. R-609 (Feb. 5, 1940), *reprinted in* 1942 Wage Hour Manual (BNA) 185; various Wage and Hour Division Opinion Letters; and the Klinghoffer line of cases. Dove, 759 F.2d at 171-72. Finally, the court held that, "[i]n keeping with the view of [its] sister courts, and giving respectful consideration to the position of the agency charged with administration of the Fair Labor Standards Act" the average workweek wage is the proper measure of compliance with minimum wage law. Id. at 172.

language of the minimum wage provision and undermines the FLSA's primary purpose of ensuring a fair wage for workers.

My review of the FLSA is guided by principles of statutory construction; my interpretation "depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis." Dolan v. Postal Service, 546 U.S. 481, 486 (2006).

I begin by looking to the language of the statute. See Kasten v. Saint-Gobain Performance Plastics Corp., 131 S. Ct. 1325, 1331 (2011). The FLSA's minimum wage provision mandates that an employer pay to each non-exempt employee "wages at the following rates: (1) except as other provided . . . not less than -- (A) $5.85 an hour, beginning on the 60th day after May 25, 2007; (B) $6.55 an hour, beginning 12 months after that 60th day; and (C) $7.25 an hour, beginning 24 months after that 60th day." 29 U.S.C. § 206(a). As the other courts to have considered this language concede, it speaks only of an *hourly* wage. Thus, while it is does not explicitly state how to calculate what an employee has been paid for a hour's worth of work, the statute's text is explicit that, with respect to the minimum wage, the only metric Congress envisioned was the hour, with each hour having its own discrete importance.[4]

To be sure, other parts of the FLSA speak of a "workweek." But, this unit of time is used for determining worker entitlement to other protections, most importantly overtime, not for assessing violations of the minimum wage law. See, e.g., 29 U.S.C. § 207(a)(2) ("[N]o employer

---

[4] In 1961, Congress amended the minimum wage provision to include the phrase "in any workweek" to the following opening sentence: "Every employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of good for commerce. . . . " An Act to Amend the Fair Labor Standards Act, Pub. L. No. 87-30, § 6(a), 75 Stat. 69 (1961). However, as the Act's purpose statement makes explicit, the phrase "workweek" was not intended to change the discrete importance of each hour. See id. 75 Stat. 65. Rather, the amendment was part of Congress' attempt to "to provide coverage for employees of large enterprises engaged in retail trade or service and of other employers engaged in commerce or in the production of goods for commerce." Id.

shall employ any of his employees who in any workweek is engaged in commerce . . . for a workweek longer than forty hours . . . unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."). In fact, the other provisions of the FLSA support the conclusion that, for the purpose of determining a minimum wage violation, the use of any unit of time other than an hour is a contrivance. When Congress meant to use the word "workweek" it did so. When it meant to use "hour" that was the word it used.

The FLSA's legislative history does not explicitly address whether an hour-by-hour or weekly-average method should be employed when determining compliance with the minimum wage law. However, it does makes clear that Congress' overriding riding purpose when enacting the FLSA was to ensure, as the bill's name implies, fairness for workers. "The principal congressional purpose in enacting the [FLSA] was to protect all covered workers from substandard wages and oppressive working hours, 'labor conditions [that are] detrimental to the maintenance of the minimum standard of living necessary for health, efficiency and general well-being of workers.'" Barrentine v. Arkansas-Best Freight Sys. Inc., 450 U.S. 728, 739 (1981) (citing 29 U.S.C. § 202(a)). One way Congress attempted to effectuate this somewhat amorphous goal through the FLSA was by "guarantee[ing] a minimum livelihood to the employees covered by the Act," Klinghoffer, 285 F.2d at 490 (citing H.R. Rep. No. 75-2738, at 28 (1938); Sen. Rep. No. 75-884, at 1-3 (1937); H.R. Rep. No. 75-1452, at 8-9 (1937)). While the Senate and House reports do not indicate whether Congress had in mind a formula for determining the amount necessary for "a minimum livelihood," they do reveal that Congress considered the test to be whether a worker received "'a fair day's pay for a fair day's work,'"

Overnight Motor Transp. Co. v. Missel, 316 U.S. 572, 578 (1942) (quoting 81 Cong. Rec. 4983 (1937) (message of President Roosevelt)); see also Barrentine, 450 U.S. at 739.[5]

Congress' primary concern with protecting worker – not employers – buttresses the above conclusion that the plain language of the minimum wage provision should be read as an endorsement of the hour-by-hour method. When a statute is susceptible to two opposing interpretations – here, the hour-by-hour and weekly average methods – it must be read "in the manner which effectuates rather than frustrates the major purpose of the legislative draftsmen." Shapiro v. United States, 335 U.S. 1, 31-32 (1948). While the weekly method does ensure that workers earn a base amount after working a certain number of hours in a week, it frustrates the overall purpose of promoting fairness for workers.

Take the Barbatine example above. There, CHA intended for the $260 to compensate for only the 26 hours she was scheduled to work. CHA, therefore, got four free hours of work from Barbatine, while Barbatine received the same amount of compensation after working 30 hours as she would have for working 26 hours. Such a compensation scheme does promote not an environment in which a worker is ensured "a fair day's pay for a fair day's work.'" See Travis, 41 F. Supp. at 9 ("[I]f the act is given a very strict construction[,] averaging is probably not permitted."); see also Dove, 759 F.2d at 171.

---

[5] One of the ways that Congress articulated it overriding concern for worker fairness was by imposing strict liability on employers, signaling that even well-intentioned and negligent employees were liable. See 29 U.S.C. §§ 206, 207; see also 29 U.S.C. § 255(a). In 1966, Congress amended the statute of limitations provision of the FLSA to extend the two-year limit to three years for causes of action "arising out of a willful violation." See 29 U.S.C. § 255(a) (1966). This indicates that, while Congress wanted to impose strict liability, it was also concerned with the employer's intent. Put another way, an important aspect of fairness is whether an employer is intentionally taking advantage of an employee. By purposefully paying $0 for certain hours of work, an employer is arguably acting intentionally to exploit a worker.

Taken together, the plain language of the minimum wage provision, the remaining parts of the FLSA, and the Congress' primary goal of protecting workers buttresses the conclusion that Congress intended for the hour-by-hour method to be used for determining a minimum wage violation.[6] Here, Plaintiffs have alleged that CHA knew the Plaintiffs were working more hours than reported on their time sheet and that it was not compensating its employees for this time. In other words, Plaintiffs have alleged that CHA intentionally paid its workers $0 for each

---

[6] To the extent that any – albeit minimal – ambiguity remains, under the familiar Chevron framework, this Court would generally defer to the interpretation of the Department of Labor ("DOL") as reflected in its regulations. Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-45 (1984); see Christensen v. Harris Cnty., 529 U.S. 576, 586-88 (2000); Duckworth v. Pratt & Whitney, Inc., 152 F.3d 1, 5-6 (1st Cir. 1998). However, the DOL has not promulgated regulations governing the calculation method that should be used for determining a minimum wage violation. See 29 C.F.R. § 776, et seq; see Dove, 759 F.2d at 172 & n.7. In 29 C.F.R. § 776.4(a) (1984), the DOL explains that the "workweek is to be taken as the standard in determining the applicability of the Act," meaning that "if in any workweek an employee is engaged in both covered and noncovered work he is entitled to both the wage and hours benefits of the Act for all the time worked in that week, unless exempted there from by some specific provision of the Act." However, this regulation speaks simply to the "applicability" of the FLSA, not how to determine the hourly wage for purpose of the minimum wage. See Dove, 759 F.2d at 172 n.7.

The DOL has produced a few opinion letters and manuals that endorse the use of the weekly average methods. For instance, in 1940, the General Counsel of the Wage and Hour Division of the Department of Labor stated in a press release later incorporated in a manual that "[for] enforcement purposes, the Wage and Hour Division is at present adopting the workweek as the standard period of time over which wages may be averaged to determine whether the employer has paid the equivalent of the [the minimum wage]." Dove, 759 F.2d at 171 (quoting Wage Hour Release No. R-609 (Feb. 5, 1940), reprinted in 1942 Wage and Hour Manual (BNA) 185). And, in 2008, the DOL relied upon Klinghoffer when responding to a school's request for an opinion regarding its compliance with the minimum wage and overtime provision of the FLSA. U.S. Dept't of Labor, Opinion Letter FLSA 2008-5 (May 30, 2008), *available at* http://www.dol.gov/whd/opinion/flsa.htm (last visited Aug. 12, 2011).

However, these opinion letters and manual are entitled to only "respect," not deference, Christensen, 529 U.S. at 587 (quoting Skidmore v. Wift & Co., 323 U.S. 134, 140 (1944)), and "only to the extent that th[e]se interpretations have the 'power to persuade.'" I do not find them persuasive for several reasons. Most importantly, they do not engage with the FLSA's purpose of ensuring a fair wage for employees. Furthermore, the DOL's 1940 press release was "mindful" that the FLSA defined the minimum wage as an hourly rate, noting that its opinion did not bind the court and, in fact, that

> the courts might hold to be a violation of the law [a case] where the employer does not pay anything for hours properly considered to be hours worked . . . but until directed otherwise by authoritative ruling of the courts, the Division will take the workweek as the standard for determining whether there has been compliance with the law.

Dove, 759 F.2d at 172 (quoting Wage Hour Release No. R-609 (Feb. 5, 1940)). Likewise, the DOL's May 2008 letter illustrated that the agency was simply following the Second Circuit's ruling in Klinghoffer, in the absence of conflicting judicial interpretation, rather than offering their own independent conclusion.

unrecorded hour worked during their meal breaks and before/after their shifts.[7] This allegation is sufficient to state a claim for a minimum wage violation at this stage, and CHA's motion to dismiss Plaintiffs' FLSA minimum wage claim is **DENIED**.

### b. Overtime (Norceides only)

Defendants argue that, to the extent that the Norceides (Barbatine and Narces) seek to recover overtime pay, their claims should be dismissed because their declarations do not provide sufficient support for their claim that they worked more than 40 hours in any given work week. CHA is placing too high an evidentiary burden on Plaintiffs at the pleading stage. In their complaint, Plaintiffs claim that they have worked in excess of 40 hours in a week.[8] That is

---

[7] Indeed, Defendants have repeatedly claimed that, had the employees reported that they had worked extra hours, they would received additional compensation.

[8] In fact, Narces' affidavit details how he worked over 40 hours. Narces says that he worked for CHA as a Registered Nurse "approximately 3 shifts per week, always 12.5 hour shifts," from October 2009 to August 2010. Narces Decl. ¶ 1. And, since August 2010, he has had "one 12.5 hour [shift] at Cambridge hospital and 8.5 hour shifts at Whidden hospital for 32 hours a week." Id. He was supposed to get a 30 minute meal break during each shift, but his "meal breaks were interrupted more than half of the time." Id. ¶¶ 1-2. Nonetheless, his paycheck always show a 30 minute deduction for the full meal break. Id. ¶ 3. Similarly, he was "paid based only on [his] scheduled shift, as opposed the times [he] beg[an] and end[ed]" work, even thought he routinely started early and worked late. Id. ¶ 4. By defendant's math, between October 2009 through August 2010, Narces worked at most 40 hours, but not more. However, Narces says that he worked "approximately" three shifts. Id. ¶ 1. As a result, there certainly could have been weeks that he worked four shifts, and during those weeks, he would have worked more than 40 hours, even if he always got a meal break and never started early or left late.

-13-

sufficient at this point.⁹  Accordingly, CHA's motion to dismiss Plaintiffs' FLSA overtime claim is **DENIED**.

### 2. State Law Claims (Count II)

Plaintiffs allege violations of Mass. Gen Law ch 149, §§ 148, 150, which mandates that non-exempt hourly employees be paid their hourly wage (also known as their straight-time wage) for all time worked; and Mass. Gen. Law ch. 151, §§ 1A, 1B, which requires overtime for all hours worked in excess of 40 in a week.¹⁰  Defendant argues that 1) Plaintiffs' claim for unpaid straight-time wages fails because they did not exhaust their administrative remedies; and 2) Plaintiffs' overtime claim fail because CHA employee are subject to the hospital exemption.  I will address each in turn.

#### a. Unpaid Straight-Time Wages - Exhaustion

Sections 148 and 150 of Mass. Gen. Laws ch. 149 work in tandem.  Section 148 provides that all non-exempt workers have the right to receive straight-time wages for each hour worked, while Section 150 grants an aggrieved employee the right to bring a civil action for a violation of Section 148.  Under Section 150, an employee's private right of action is conditioned on the

---

⁹ This factual dispute is particularly unsuited for the pleading stage given the lack of payroll records in this case.  According to Plaintiffs, CHA lacks records of every hour worked by Plaintiffs, Compl. ¶ 10, in violation of 29 C.F.R. § 516.2(7), which mandates that every employer keep and preserve a payroll or other records containing, amongst other things, information on "[h]ours worked each workday and total hours worked each workweek."  As the Supreme Court made clear in Anderson v. Mt. Clemens Pottery, this lack of records encumbers the employer, not the employee. 328 U.S. 680, 686-87 (1946).  At trial, if the evidence shows that CHA did not maintain the legally required records and an employee has shown that he has performed some amount of work for which he was improperly compensated, then the burden "shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." Id.  Extending Anderson's burden-shifting doctrine to the pleading stage, in the absence of records, a plaintiff need do no more than allege that she has worked in excess of 40 hours in a week in order to state a claim for an FLSA overtime violation.

¹⁰ Currently, Plaintiffs have dropped their state law claims on behalf of any unionized employees.  (Narces is the only named unionized Plaintiff.)  Accordingly, this court need not address Defendant arguments concerning preemption by the Labor Management Relations Act.

filing of a complaint with the Massachusetts Attorney General.[11] See, e.g., Sterling Research, Inc. v. Pietrobono, No. 02-40150-FDS, 2005 WL 3116758, at *11 (D. Mass. Nov. 21, 2005); Daly v. Norton Co., No. 99452B, 1999 WL 1204011, at *2 (Mass. Super. Nov. 15, 1999) (noting that the provision "mandates that all compensation claims must be filed with the Office of the Massachusetts Attorney General before any court may adjudicate such claims").

According to Joan Bennett, a senior vice president at CHA, neither Narces Norceide nor Barbatine Norceide has filed a complaint with the Massachusetts Attorney General's Office regarding claims for unpaid wages. Bennett Aff. ¶ 11 (document #16-1). Plaintiffs did not address this issue in their complaint, but they have since stated in their briefing and at oral argument that each of the three named plaintiffs filed complaints with the Attorney General's office for unpaid wages. Their oral representations notwithstanding, Plaintiffs are obliged to seek to amend the complaint to make this claim. CHA's motion to dismiss Plaintiffs state-law claim for unpaid straight-time wages is **GRANTED WITHOUT PREJUDICE.**

### b. Overtime

Under state law, a worker employed in a "hospital, sanatorium, convalescent or nursing home, infirmary, rest home or charitable home for the aged" is not protected by the overtime provision. Mass. Gen. Laws ch. 151, § 1A(16). Claiming that Plaintiffs are all "hospital"

---

[11] Mass. Gen. Law. ch 149, § 150 states:

> An employee claiming to be aggrieved by a violation of sections 33E, 148, 148A, 148B, 150C, 152, 152A or 159C or section 19 of chapter 151 may, 90 days after the filing of a complaint with the attorney general, or sooner if the attorney general assents in writing, and within 3 years after the violation, institute and prosecute in his own name and on his own behalf, or for himself and for others similarly situated, a civil action for injunctive relief, for any damages incurred, and for any lost wages and other benefits.

employees, CHA moves to dismiss Plaintiffs' state-law overtime claims.[12]  Plaintiffs respond that this is "not a case about hospital employees *only*," noting that Defendant have more than 30 clinical locations "both in the community and at its hospital campuses."  Pls.' Mot. Amend Compl. ¶ 3 (document #29).  While Plaintiffs may indeed be correct that CHA employees in the community centers are entitled to overtime under state-law, Narces, Barbatine, and Walsh, by their own admissions, are hospital employees.  See Barbatine Decl. ¶ 1; Narces Decl. ¶ 1; Walsh Decl. ¶ 1.  Accordingly, Narces, Barbatine, and Walsh's claims for overtime are **DISMISSED**.[13]

### B. Plaintiffs' Motion to Amend

Plaintiffs have moved to amend their complaint in two ways:  first, to clarify that they are bringing their state-law claims (Count II) on behalf of non-union, non-exempt employees only; and, second, to add a claim for breach of contract on behalf of non-union, non-exempt employees (Count III).  CHA does not contest Plaintiffs' effort to limit its state-law claims to non-union employees, but it does object to the addition of the breach of contract claim.

Since Plaintiffs have already amended their complaint once as a matter of course, their request to add a breach of contract claim requires leave of court, which I "should freely give . . . when justice so requires," Fed. R. Civ. P. 15(a)(2), unless the amendment is futile, rewards undue delay, or causes grave injustice to CHA, see Adorno v. Crowley Towing And Transp. Co., 443 F.3d 122, 126 (1st Cir. 2006); Patton v. Guyer, 443 F.2d 79, 86 (10th Cir. 1971).  In this

---

[12] CHA also attacks Plaintiffs' state-law overtime claim on the same grounds that they challenged the FLSA overtime claim, namely that some of the Plaintiffs have not sufficiently alleged that they worked more than 40 hours per week without receiving overtime pay.  CHA's argument with respect for the state-law claim is rejected for the same reasons as it was for the FLSA overtime claim.  See Swift v. AutoZone, Inc., 441 Mass. 443, 447 (2004) (quoting Valerio v. Putnam Assocs. Inc., 173 F.3d 35, 40 (1st Cir. 1999)) (finding that the state overtime laws are "intended to be 'essentially identical'" the FLSA's overtime provision).

[13] This finding, however, does not necessarily dismiss the overtime claim for all class members.

case, justice so requires Plaintiffs' amendment because federal and state wage-and-hour laws do not provide for all of the potential relief to which Plaintiffs may be entitled under a breach of contract claim.[14] Nor does this amendment subject CHA to "a grave injustice." See Patton, 443 F.2d at 86. This case is still at the pleading stage, and Plaintiffs' breach of contract claim stems for the same general set of alleged practices employed by CHA as do the FLSA and state-law claims, meaning CHA is not being forced to defend itself on a whole new front. Accordingly, Plaintiffs' motion to amend (document #29) is **GRANTED**.

C.     **Class Certification**

Plaintiffs have moved for conditional certification of their FLSA claims. Under the FLSA, an employee may bring an action on behalf of him/herself and other "employees similarly situated." 29 U.S.C. § 216(b). This Court has generally used a "two-tiered" approach for determining whether putative class members are similarly situation for purposes of class certification. See, e.g., O'Donnell v. Robert Half Int'l, Inc., 429 F. Supp. 2d 246, 249 (D. Mass. 2006); Trezvant v. Fidelity Emp'r Servs. Corp., 434 F. Supp. 2d 40, 42-45 (D. Mass. 2006). At the first step (also known as the notice stage), the Court relies upon the pleadings and affidavits to determine whether the plaintiffs have made "a modest factual showing" that the putative class members were together subject to "'a single decision, policy, or plan that violated the law.'" Trezvant, 434 F. Supp. 2d at 43 (quoting Thiessen v. Gen. Elec. Capital, 267 F.3d 1095, 1102 (10th Cir. 2001)). At the second step, the court revisits the certification issue at the completion

---

[14] Despite CHA's assertion to the contrary, Plaintiffs breach of contract claim is not necessarily preempted by the FLSA. In certain situations, the FLSA may preempt causes of action in which a party seeks to enforce rights guaranteed by the FLSA, see, e.g., Anderson v. Sara Lee Corp., 508 F.3d 181, 194 (4th Cir. 2007) (noting that plaintiffs cannot enforce their FLSA rights by way of a § 1983 action). In this case, however, Plaintiffs' breach of contract claim may extend to rights not guaranteed by the FLSA. As CHA repeatedly emphasizes, Plaintiffs have no right to recoup unpaid straight-time wages under the FLSA, though they may have such a remedy under their employment contracts.

of discovery using a stricter standard. Kane v. Gage Merch. Servs., Inc., 138 F. Supp. 2d 212, 214 (D. Mass. 2001).

Plaintiffs' motion for conditional class certification is at the first step. At this notice stage, given the minimal evidence available, Plaintiffs' burden of proving that putative class members are similarly situated is "fairly lenient," typically resulting in conditional certifications of the representative class. Trezvant, 434 F. Supp. 2d at 43. Plaintiffs satisfy their burden if they put forth "some evidence that the legal claims and factual characteristics are similar." Id. at 44. Here, Plaintiffs have done so by making a modest factual showing that the putative class members were all subject to CHA's practice of discouraging its workers from recording time worked before and after their shifts and during their meal breaks, thereby paying its employees based on their theoretical schedules rather than actual time worked.

To be sure, CHA assigned its employees to various different time-keeping systems, some of which theoretically allowed employees to record the full time they worked. However, regardless of the timekeeping systems used, Plaintiffs were all allegedly either explicitly or implicitly "discouraged" by their managers from reporting any time worked during meal breaks or before/after their shifts. Compl. ¶ 23; see Narces Decl.; Barbatine Decl.; Walsh Decl. As described by Walsh, "[t]here was . . . an atmosphere whereby if you complained about not getting a meal break or not being paid for time worked outside of your scheduled shift, management would ask: 'Do you still want your job?'" Walsh Compl. ¶ 5. Barbatine and Narces describe the ways that CHA made it difficult for them to report having worked additional time. Accordingly to Narces, his complaints that he had worked through his break fell on deaf ears.

Narces Decl. ¶ 3. Barbatine likewise alleges that "[t]here was no avenue for [her] to complain that [she] did not get a meal break[.]" Barbatine Decl. ¶ 5.

While not a formal policy, CHA's practice was uniform, effectively depriving workers of compensation for time worked beyond their shifts. As mentioned above, the FLSA is a strict-liability statute, meaning than an employer is obliged to ensure that an employee who could have but did not record all time on the job is properly compensated with a minimum wage and overtime for all time *actually* worked. See 29 U.S.C. §§ 206, 207; see also 29 U.S.C. § 255(a). Employers and employees do not have equal bargaining power. Employees, often fearing that they may lose their jobs if they do not oblige, regularly succumb to employer pressure to perform uncompensated labor.

Accordingly, Plaintiffs' motion for conditional certification (document #15) is **GRANTED**, and Plaintiffs' proposed opt-in notice and form (document #15-1) are approved.

### III.  CONCLUSION

For the foregoing reasons, CHA's Partial Motion to Dismiss (**document #16**) is **DENIED IN PART** and **GRANTED IN PART**, Plaintiffs' Motion to Amend (**document #29**) is **GRANTED**, and Plaintiffs' Motion for Conditional Certification of FLSA Claims **(document #15)** is **GRANTED**.

**SO ORDERED.**

**Date:  August 28, 2011**        */s/ Nancy Gertner*
                                  **NANCY GERTNER, U.S.D.C.**